# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

William James Holisky II,                                    Civ. No. 14-395 (DSD/JJK)

      Plaintiff,

v.

Carolyn W. Colvin,                                           **REPORT AND**
Acting Commissioner of Social Security,                      **RECOMMENDATION**

      Defendant.

---

Lionel H. Peabody, Esq., Peabody Law Office, counsel for Plaintiff.

Ann M. Bildsten, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff William James Holisky II seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for a period of disability and supplemental security income.  The parties have filed cross-motions for summary judgment.  (Doc. Nos. 10, 12.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. L.R. 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

# BACKGROUND

## I.   Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on May 10, 2010, alleging a disability onset date of January 1, 1990.  (Tr. 43, 209–218.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claims initially on August 4, 2010 (Tr. 120–21), and upon reconsideration on October 15, 2010 (Tr. 122–23).  Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ") and testified at the administrative hearing on January 12, 2012.  (Tr. 147, 79–119.)  On January 27, 2012, the ALJ issued an unfavorable decision on Plaintiff's applications.  (Tr. 40– 61.)  Plaintiff filed timely request for review (Tr. 38–39), and the Appeals Council denied that request on May 15, 2013.  (Tr. 23–26.)  Denial of review made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On January 18, 2014, the Appeals Council granted Plaintiff's request for additional time to seek court review.  (Tr. 1–6.)  Plaintiff filed this action on February 13, 2014, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Doc. No. 1.)  On May 1, 2014, Defendant filed an Answer.  (Doc. No. 8.)  Thereafter, pursuant to D. Minn. LR 7.2, the parties filed cross-motions for summary judgment.  (Doc. Nos. 10, 12.)

---

[1]     Throughout this Report and Recommendation, the abbreviation ("Tr.") is used to reference the Administrative Record filed at Docket No. 9.

II.    **Factual Background**

William Holisky is a college graduate and has past work as a certified public accountant, senior manager, financial controller, director of financial planning, and chief financial officer.  (Tr. 249.)  Plaintiff was 58 years old on December 31, 2010, his last date insured.[2]  (Tr. 45, 54.)  In his applications, he alleged disability due to bipolar disorder and depression.  (Tr. 247.)

Plaintiff alleged disability commencing January 1, 1990.  (Tr. 45, 211.)  However, Plaintiff performed substantial gainful activity for several years after that date.  (Tr. 45.)  The periods in which Plaintiff did not report substantial gainful activity are:

- January 1, 1996 through December 31, 1996

- January 1, 2003 through December 31, 2003

- January 1, 2006[3] through December 31, 2010

(Tr. 45–46.)   Thus, the above time periods are potentially relevant for disability determination.  (*Id.*)

---

[2]    A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

[3]    Plaintiff had earnings in 2006, but had not yet filed taxes for that year. (Doc. No. 11, Pl's Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 2.)  Plaintiff reports that he stopped working on April 15, 2006.  (Tr. 202.)

### A.    Medical Records

### i. Medical Records Prior to Last Date Insured

In June 2001, Plaintiff sought treatment at Miller Dwan Medical Center in Duluth, Minnesota due to his fluctuating mood, irritability, and anger.  (Tr. 354.) He reported no significant previous psychiatric history, but described a long history of alcohol dependence.  (*Id.*)  Dr. Stan Kruglikov diagnosed Plaintiff with alcohol dependence and bipolar disorder.  (Tr. 355.)  Plaintiff completed a twelve-day partial hospitalization program.  (Tr. 365.)  The discharge summary from September 2001 stated that Plaintiff "was doing much better" and felt optimistic about his future.  (*Id.*)  Plaintiff was prescribed Depakote, a drug used to treat bipolar disorder.  (Tr. 365.)

In June 2003, Plaintiff sought treatment for depression from Clinical Nurse Specialist Regina Richards at Duluth Clinic Behavioral Health.  (Tr. 368.)  Plaintiff reported that after his treatment two years prior, he stopped taking Depakote after a "few months."  (*Id.*)   He stated that he had no energy, he criticized himself often, and he struggled to make himself do anything.  (*Id.*)  Ms. Richards observed that "[h]is loss of energy and flatness of affect feels to be just a bit psychotic," so she prescribed the anti-psychotic drug Risperdal.  (Tr. 369–70.) Ms. Richards also prescribed the anti-depressant Prozac.  (Tr. 370.)

Plaintiff saw Ms. Richards for a follow-up appointment in September 2003. (Tr. 372.)  Ms. Richards wrote, "All in all, the patient seems to be doing quite a bit

better." (*Id.*)  Plaintiff continued, however, to have some symptoms of anxiety. (*Id.*)  Ms. Richards increased Plaintiff's dosage of Prozac.  (Tr. 372–73.)

In December 2003, Plaintiff told Ms. Richards that his depressive symptoms had not improved.  (Tr. 374.)   Ms. Richards prescribed Lithium, a medication used to treat bipolar disorder.  (*Id.*)

Plaintiff next saw Ms. Richards in October 2004.  (Tr. 377.)  Plaintiff reported that he had stopped taking Risperdal about three months before, but was still taking Prozac.  (*Id.*)  Plaintiff stated that he was tired and did not want to do anything.  (*Id.*)  Ms. Richards prescribed the drug Seroquel to treat Plaintiff's anxiety and regulate his sleep.  (*Id.*)  Ms. Richards continued Plaintiff's Lithium prescription and changed his antidepressant medication to Paxil.  (Tr. 378.)

Also in October 2004, Plaintiff sought individual therapy and psychiatric consultation at the Human Development Center.  (Tr. 382.)  Clinical social worker Carol Johnson conducted a diagnostic assessment.  (Tr. 382–85.)  Plaintiff reported that he had no recent incidents of mania, but his depression was "spiraling downward." (Tr. 382.)  He stated that he had been drinking to excess approximately once per month.  (*Id.*)  He had lost interest in activities he used to enjoy and struggled to get out of bed.  (*Id.*)  Ms. Johnson described Plaintiff's behavior as "very social, appropriate, and respectful."  (Tr. 384.)  She suggested that Plaintiff attend Alcoholics Anonymous meetings.  (*Id.*)

In October 2004, Ms. Johnson wrote that Plaintiff "[s]eems to put up road blocks when I suggest changes he may need to make to his lifestyle.  He always

returns to how the depression prohibits him from having any energy to make changes." (Tr. 387.)  Plaintiff met with Ms. Johnson several times for counseling in December 2004 and January 2005.  (Tr. 386–95.)

In December 2004, Ms. Richards noted that Plaintiff was doing "pretty well." (Tr. 379.)  Plaintiff's mood was more stable and he was sleeping very well. (*Id.*)  Plaintiff stated he planned to go to San Antonio, Texas for the tax season and work with some friends.  Ms. Richards wrote, "He did this last year and he was able to make a few bucks, and that takes care of most of his needs for the rest of the year." (*Id.*)

After working in Texas for thirteen weeks, Plaintiff returned to Minnesota at the end of April 2005.  (Tr. 411.)  In May 2005, Plaintiff saw a clinical nurse specialist at the Human Development Center.  (*Id.*)  Plaintiff felt he was "doing well" and denied any symptoms.  (*Id.*)  During a June 2005 visit with psychiatrist John Glick, Plaintiff felt his mood was stable.  (Tr. 410.)

In August 2006, Plaintiff informed a clinical nurse specialist that he was drinking regularly and had gotten a DWI.  (Tr. 407.)  Plaintiff reported racing thoughts and "elevated" behavior.  (*Id.*)  Plaintiff continued taking Paxil and his dose of Lithium was increased.  (*Id.*)

While incarcerated for periods between 2007 and 2010, Plaintiff received treatment from the Minnesota Department of Corrections.  (Tr. 412–31.)  Plaintiff had been charged with second degree assault after shooting out the windows of the home of an ex-girlfriend.  (Tr. 425, 427.)  While in county jail, Plaintiff's

antidepressant was changed from Paxil to Fluoxetine.[4]  (Tr. 427.)  During a psychiatric evaluation in June 2008, Plaintiff appeared articulate and logical with above-average intellect.  (Tr. 428.)  He described his mood as "great."  (*Id.*)  A nurse practitioner suggested that Plaintiff discontinue taking Lithium but continue on Fluoxetine.  (Tr. 428–29.)

In July 2008, Plaintiff reported a return of "bipolar-like symptoms," including racing thoughts, irritability, and sleep difficulties.  (Tr. 425–26.)  A psychologist concluded that Plaintiff was not endorsing sufficient symptoms at that time to meet the criteria for either major depressive disorder or bipolar disorder, "either because he does not have the disorders, or, because psychotropic medication has mitigated mental health symptoms."  (Tr. 426.)

In August 2008, Plaintiff felt agitated, and he feared the return of another manic episode.  (Tr. 424.)  Dr. Kluznik wrote that Plaintiff showed no signs of distress or impairment.  (*Id.*)  Speech was normal, he was well groomed, and there was nothing unusual in his thought content.  (*Id.*)  Dr. Kluznik restarted Plaintiff on Lithium and increased his dosage of Prozac.  (*Id.*)

In September 2008, Plaintiff was very happy with the combination of Lithium and Prozac.  (Tr. 423.)  Plaintiff felt his sleep, anger, irritability, and mood had stabilized.  (*Id.*)  In January 2009, his mood continued to be stable.  (Tr. 422.)

---

4      Fluoxetine is an anti-depressant commonly known under the brand name Prozac. *See Fluoxeteine,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html (last visited Dec. 12, 2014).

In March 2009, Plaintiff was paroled from prison.  (Tr. 399.)  In April 2009, Plaintiff underwent an assessment at the Human Development Center as a condition of his parole.  (Tr. 398.)  The counselor diagnosed Plaintiff with adjustment disorder (unspecified), phase of life problem, bipolar disorder (by client reported history), and alcohol abuse (by client reported history).  (Tr. 400.)

In June 2009, Plaintiff returned to prison on a probation violation. (Tr. 418.)  Plaintiff stated he would rather live in prison than under intense supervision.  (*Id.*)  Dr. Hardict noted that Plaintiff's overall mood was very stable and his mental status examination was normal.  (*Id.*)  In September 2009, Dr. Kluznik described Plaintiff as "clinically stable with mild depression." (Tr. 417.)

In December 2009, Plaintiff reported that he had been experiencing depressive symptoms for approximately three months.  (Tr. 415.)  He was alert, orientated, calm, and cooperative during the psychiatric assessment.  (*Id.*) Dr. Hardict increased Plaintiff's dosage of Prozac.  (Tr. 416.)  In March 2010, Plaintiff told Dr. Hardict he was "doing much better overall" and said he hoped to "resume his retirement" upon his release.  (Tr. 413.)

After his release, Plaintiff saw Clinical Nurse Specialist Theresa Carr in May 2010.  (Tr.  458–63.)  Plaintiff was homeless.  (Tr. 462.)  He was neatly groomed, cooperative, alert, and well-oriented.  (Tr. 461.)  His speech was normal and his thoughts were clear and relevant.  (*Id.*)  However, Plaintiff's sleep was disturbed, his mood was depressed, and his affect was blunted.  (*Id.*)

Plaintiff stated his goals were to "get on disability," live in his own place, enjoy activities again, and maintain relationships.  (Tr. 461–62.)  Ms. Carr wrote, "His ability to maintain gainful employment is highly doubtful at this time specifically with this fairly unstable mood and psychosocial status."  (Tr. 462.)  In July 2010, Ms. Carr recommended Adult Mental Health Rehabilitative Services to help Plaintiff find appropriate housing and manage his bipolar symptoms.  (Tr. 442–43.)

In August 2010, Plaintiff saw Ms. Carr for a psychiatric evaluation. (Tr. 512–14.)  Plaintiff was living in a van.  (Tr. 512.)  Plaintiff was fairly well stabilized on medication, but he felt his mood was "a little lower."  (Tr. 514.) Ms. Carr recommended lowering the dosage of lithium to target Plaintiff's mood and energy concerns, and instructed Plaintiff to consider talk therapy to help with skills for mood control.  (*Id.*)

In September 2010, Plaintiff returned to Ms. Carr for a medication management appointment.  (Tr. 516.)  Plaintiff was not receiving counseling at that time.  (*Id.*)  He was compliant with medication as prescribed.  (*Id.*)  In the mental status examination, Plaintiff's hygiene was poor, his affect was restricted, and his mood was anxious and depressed.  (Tr. 517.)  Plaintiff's speech was appropriate, his attitude was cooperative, and his thought processes were logical.  (*Id.*)  He showed no signs of psychosis or mania.  (*Id.*)  His behavior and thought content were unremarkable.  (*Id.*)  His memory was intact, his

intelligence was average, and he maintained attention.  (*Id.*)  His reasoning, impulse control, judgment, and insight were fair.  (*Id.*)

At a medication management appointment in December 2010, Ms. Carr again conducted a mental status examination.  (Tr. 565–66.)  Plaintiff's appearance was appropriate and his appetite was too high.  (Tr. 566.)  Plaintiff's depressive symptoms had persisted for eight to nine months.  (*Id.*)  The rest of his mental status examination remained unchanged from the September 2010 examination.  (*Id.*)  Plaintiff was compliant with medication as prescribed and showed a moderate improvement in response to the medication.  (Tr. 565.)

### ii.  Medical Records After Last Date Insured

In January 2011, Plaintiff told Ms. Carr that he had stopped taking all medications because they had been stolen from his unlocked vehicle.  (Tr. 568–70.)  Ms. Carr noted "some decline in mood."  (Tr. 570.)  In February and March 2011, Plaintiff was back on his medications and showed moderate improvement in response to the medication.  (Tr. 571–76.)

In June 2011, Plaintiff sought treatment from Clinical Nurse Specialist Melissa Maki.  (Tr. 551.)  Plaintiff was depressed, lacked energy, and reported that he was sleeping up to twelve to fourteen hours per day.  (*Id.*)  Plaintiff lived in a van.  (Tr. 552.)  Plaintiff reported drinking alcohol two to three times per week.  (Tr. 552.)  At a follow-up appointment with Ms. Maki in July 2011, Ms. Maki noticed "slight improvements" in Plaintiff's affect and sleep schedule. (*Id.*)  Plaintiff also reported having a girlfriend of eight months.  (*Id.*)

10

In September 2011, Plaintiff told Ms. Maki that he had been "a little manic" for seven to ten days in August. (Tr. 556.) Plaintiff's van had been stolen so he could not access his medications. (*Id.*) He reported low mood, trouble sleeping, and feeling tired. (*Id.*) Plaintiff described himself as "broke," but reported that when he does have money, he goes to the bar for beer and pizza. (Tr. 557.) His affect and mood were neutral, and he made some jokes. (*Id.*) Although Plaintiff had slight body odor, his mental status examination was otherwise normal and unremarkable. (*Id.*)

### B.      Records Related to the Disability Process

In a May 2010 function report, Plaintiff described his activities and abilities. He slept in a van. (Tr. 269.) He regularly went to the Mission to eat and converse, went to the library, and watched sports on television. (*Id.*) He struggled to sleep during manic phases due to racing thoughts, and he slept too much when depressed. (*Id.*) He thought he would be able to do household chores and yard work if he were not homeless. (Tr. 272.) He used public transportation and walked. (Tr. 272.) He shopped for clothes and personal hygiene items. (*Id.*) When not depressed, he enjoyed hiking in the woods. (Tr. 274.) He socialized with others at the Mission or Salvation Army and emailed his two children on a daily basis. (*Id.*) He reported that his memory, concentration, ability to complete tasks, and ability to get along with others suffered when he was depressed. (Tr. 275.) He was able to follow written

instructions fairly well, but manic episodes would adversely affect this ability. (*Id.*)

In June 2010, Dr. George Horvat performed a social security consultative psychological evaluation of Plaintiff.  (Tr. 464.)  Plaintiff's clothing was clean, and his grooming and hygiene were normal.  (*Id.*)  His attention and concentration were normal, but his memory was limited.  (Tr. 465.)  His mood and his affect were depressed.  (*Id.*)  His speech was normal, and his thought content was appropriate.  (*Id.*)  His intelligence level and fund of knowledge appeared average.  (Tr. 466.)  His abstraction, judgment, and decision-making were all normal.  (*Id.*)   Dr. Horvat wrote:

> When he is on his meds, his social judgment is normal and his social maturity is responsible . . . His mental impairments impact his symptoms, and his depression especially impacts his mental functions.  He has the mental capacities to understand, remember, and follow instructions, as well as to sustain attention and concentration.  He has the mental capacity to carry out work-like tasks with reasonable persistence and pace, and to respond appropriately to brief and superficial contact with co-workers and supervisors.

(Tr. 466–67.)  Dr. Horvat opined that although Plaintiff had the mental capacity to tolerate the stress of an entry-level work place, his anger, hurt, frustration, embarrassment, and lack of social support all interfered with his ability to deal with stress.  (Tr. 467.)  Dr. Horvat diagnosed Plaintiff with bipolar disorder, depressed type.  (Tr. 466.)  He suggested regular therapy, vocational rehabilitation, psychiatric medication management, and help obtaining suitable housing.  (Tr. 467.)

In August 2010, non-examining state agency reviewer Amy Johnson completed a psychiatric review technique form.  (Tr. 474.)  Amy Johnson is a doctor of psychology.  (Tr. 120.)  Dr. Johnson concluded that Plaintiff has a bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  (Tr. 477.)  In evaluating the "B" criteria, Dr. Johnson stated that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 484.)  Dr. Johnson found no episodes of decompensation of extended duration.  (*Id.*)  She found that evidence did not establish the "C" criteria. (Tr. 485.)  In October 2010, non-examining state agency reviewer Dr. James Alsdurf affirmed Dr. Johnson's assessment.  (Tr. 523–24.)

In October 2010, Plaintiff filed a disability report.  (Tr. 297–302.)  He wrote that he was in a prolonged depression cycle and he suffered from anxiety. (Tr. 300.)  He reported sleeping fourteen hours per day.  (*Id.*)  Plaintiff filed another disability report in December 2010.  (Tr. 308–13.)  Plaintiff stated that his prolonged depression cycle had worsened and his personal care had suffered as a result.  (Tr. 308.)

In February 2011, Ms. Carr completed a Mental Functional Limitations assessment.  (Tr. 529–33.)  Ms. Carr wrote that Plaintiff had "marked" limitations in three categories: restrictions of activities of daily living, difficulties in maintaining social functioning, and deficiencies in maintaining concentration,

persistence, or pace.  (Tr. 532.)  Ms. Carr stated that Plaintiff had experienced

four or more episodes of decompensation, each of extended duration.  (*Id.*)

Ms. Carr also provided responses for the "C" criteria, indicating that a marginal

increase in stress would cause Plaintiff to decompensate, and that Plaintiff had a

history of one or more years of inability to function outside of a highly supportive

living environment.  (Tr.  533.)

### III.    Testimony at the Administrative Hearing

#### A.    Plaintiff's Testimony

Plaintiff, represented by counsel, testified as follows before ALJ Mary M.

Kunz on January 12, 2012.  (Tr. 81–119.)  Plaintiff was currently in a long

depressive cycle.  (Tr. 84.)  Plaintiff had experienced a manic cycle in 2006.  (*Id.*)

He stated, "Most depressions were debilitating, the kind where you don't get out

of bed all day, don't brush your teeth for a week."  (*Id.*)  Plaintiff could not recall

how his concentration and attention were on before December 31, 2010.

(Tr. 86.)  Plaintiff had friends, and he liked to have coffee with them at the Union

Gospel Mission.  (Tr. 89.)  Plaintiff's friends occasionally helped him by giving

him gas money.  (Tr. 89–90.)  Before the fall of 2011, Plaintiff lived off his

savings.  (Tr. 90.)  When he needed money, Plaintiff would request and receive

distributions from his Charles Schwab brokerage account.  (Tr. 90–91.)

When the ALJ asked Plaintiff what would keep him from showing up to

work, Plaintiff responded, "I guarantee, I could show up the first day of work . . .

Whether I'd show up fourth or ninth day, I don't know, probably not."  (Tr. 91.)

When the ALJ asked why he has not pursued talk therapy, Plaintiff stated that with the exception of one treatment provider mentioning therapy in passing, he does not recall being told to pursue therapy.  (Tr. 93.)

　　In response to questions from his attorney, Plaintiff testified as follows. When his depression was severe, he sometimes would stay in bed for twenty-four hours.  (Tr. 96.)  He struggled to get out of bed or take care of himself.  (*Id.*) While his depressive cycles typically lasted six to nine months, currently he had been depressed for almost two years.  (*Id.*)  He slept twelve to fourteen hours per day.  (Tr. 97.)  When he tried to get things done, he would end up staring out the window or listening to the radio.  (Tr. 98.)   When asked how often his condition was severe enough that he would not be able to himself to do things, Plaintiff stated around four times per week.  (Tr. 99.)   His anti-depressant medication had been changed several times.  (Tr. 100.)  His medical providers discontinued his Lithium because it had been "awhile" since his last severe manic phase.  (*Id.*) His current stressors included not having gas in his vehicle when the weather was extremely cold and not knowing where he would sleep that night.  (Tr. 101.)

　　When asked what would happen if he had a job, Plaintiff responded, "I'll either go into a manic phase, and do something stupid, and get fired, or I'll get depressed, I won't show up for work . . . and get fired."  (Tr. 102.)  On the days when he could function better, Plaintiff would go for a walk, go to a recreation center, visit the Mission to drink coffee, or go by the lake.  (Tr. 104.)  Plaintiff

bought groceries for himself.  (*Id.*)   He had not done laundry in nine months, but he went to a center to get free clothes.  (Tr. 104.)

## B.   Medical Expert Testimony

Dr. Karen Butler appeared as a medical expert and testified as follows. (Tr. 106–13.)  Under category 12.04, Plaintiff was diagnosed with bipolar disorder and had a historical diagnosis of alcohol dependence.  (Tr. 106–07.)  Regarding the part "B" criteria, Plaintiff had marked impairment of activities of daily living. (Tr. 107.)  In reaching this conclusion, Dr. Butler relied on the fact that Plaintiff was homeless and living in a van.  (*Id.*)   Plaintiff was able to shop, drive, use public transportation, and manage his finances, although he often let go of activities of daily living when depressed.  (*Id.*)

Dr. Butler categorized Plaintiff's social functioning as moderately impaired. (*Id.*)  Plaintiff emailed his kids, talked to others at the Salvation Army, had a girlfriend, and was reportedly friendly and polite.  (Tr. 107–08.)  Dr. Butler also noted that one exhibit stated Plaintiff avoided other people and preferred to spend time alone.  (Tr. 108.)

Dr. Butler found that Plaintiff's concentration, pace, and persistence were moderately impaired.  (*Id.*)  In Plaintiff's medical record, he was able to do serial sevens and remember all five of the past five presidents, and Dr. Butler cited several medical notes that Plaintiff maintained attention.  (*Id.*)

Dr. Butler found no episodes of decompensation as hallmarked by psychiatric hospitalization of two weeks' duration or greater, placement in

treatment, or an increased frequency in outpatient psychotherapy.  (*Id.*)

Accordingly, Dr. Butler found that Plaintiff did not satisfy the part "B" criteria.  (*Id.*)

Dr. Butler opined that Plaintiff did not satisfy the part "C" criteria either.

(*Id.*)  Dr. Butler stated, "I would cede that that opinion is . . . different than that

offered by the treating professional."  (*Id.*)  Dr. Butler then cited nine professional

health questionnaires that consistently rated Plaintiff's depression in the

moderate range.  (*Id.*)

Dr. Bulter acknowledged that a medical provider had rated Plaintiff's

depression as moderate in June 2011.  (Tr. 109.)  Dr. Butler also noted that

during 2011, Plaintiff's depression was reportedly mild to moderate on a daily

basis with no mania.  (*Id.*)  She cited recommendations in the medical record for

vocational rehabilitation, medical management, and assistance with housing.

(*Id.*)  Dr. Butler testified that lack of stable housing "can be a source of stress and

certainly exacerbates a person's mental health symptoms."  (*Id.*)

The ALJ asked Dr. Butler to describe Plaintiff's work-related limitations.

(*Id.*)  Dr. Butler recommended work that was simple and unskilled through lower

semi-skilled work.  (*Id.*)  To reduce work-related stress, she recommended work

without rapid assembly line pace and work where there would be brief and

superficial contact with others.  (*Id.*)  The ALJ asked Dr. Butler to consider

Plaintiff's history of alcohol dependence and asked if there would be any

changes in the ratings or assessment of work-related functions were Plaintiff not

using alcohol.  (Tr. 110.)  Dr. Butler stated her assessments and ratings would not change.  (*Id.*)

Plaintiff's attorney noted that Dr. Butler disagreed with Ms. Carr's opinion that Plaintiff had marked difficulties in concentration, persistence, or pace. (Tr. 110.)  Dr. Butler responded, "[S]he, as the treating person, certainly is in a better position to evaluate his concentration than I."  (Tr. 111.)  Dr. Butler pointed out, however, that several of Ms. Carr's treatment notes show more moderate difficulties in concentration, persistence, or pace.  (*Id.*)

While Dr. Butler acknowledged that Plaintiff's GAF[5] scores from May 2010, June 2010, and June 2011 showed a serious level of depression, she did not see a twelve-month consecutive period of serious depression.  (Tr. 112–13.)  She agreed that bipolar disorder fluctuates in severity.  (Tr. 113.)

## C.   Vocational Expert Testimony

Edward Utitis testified as a vocational expert.  (Tr. 113.)  Mr. Utitis had reviewed the record.  (Tr. 114.)  The ALJ asked Mr. Utitis to consider the hypothetical of a 59-year-old individual who was 58 years old on the last day insured.  (*Id.*)  The individual had a college education, work experience as described in the vocational expert's report, a diagnosis of bipolar disorder, and a history of alcohol dependence.  (*Id.*)  Due to bipolar disorder, the individual would

---

[5]     The Global Assessment of Functioning Scale (GAF), a scale of 0 to 100, is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults.  *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-tr*) 32 (American Psychiatric Association 4th ed. text revision 2000).

be limited to routine, repetitive, simple work.  (Tr. 115.)  The work should involve

not more than brief and superficial contact with others, and should not be rapidly

paced.  (*Id.*)

Mr. Utitis testified that such an individual could not perform any of the jobs

held by the Plaintiff in the past.  (*Id.*)   Mr. Utitis stated that the hypothetical

individual could perform a number of medium unskilled jobs that are repetitive in

nature, such as a hand packager,[6] machine packer,[7] and production helper.[8]

(*Id.*) The ALJ asked Mr. Utitis to additionally assume that, because of problems

with severe depression, the individual would be unable to get to work as

frequently as one to four times per week.  (Tr. 116.)  Mr. Utitis stated, "I don't

know of any employers that would tolerate that, Judge."  (*Id.*)

Plaintiff's counsel then asked Mr. Utitis about the standards for attendance

in competitive employment.  (Tr. 117.)  Mr. Utitis testified that a person would

need to show up regularly, be on time, work a regular eight-hour day, not leave

early, and not take more than about one vacation or sick day per month.  (*Id.*)

Plaintiff's counsel stated that according to Ms. Carr, up to one-third of the time,

Plaintiff would be unable to maintain attention and concentration for extended

periods of time, perform activities within a schedule, work with others without

being distracted, complete a normal work day or week without interruption due to

---

[6]     *See* DOT 920.587-018, with 8,000-plus positions in Minnesota.

[7]     *See* DOT 920.685-078, with 4,000-plus positions in Minnesota.

[8]     *See* DOT 529.686-070, with 3,000-plus positions in Minnesota.

psychological symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.  (*Id.*)  Mr. Utitis stated that a person with such limitations would not be able to do any of the jobs he had described or any other competitive work.  (*Id.*)  Mr. Utitis also testified that employers would not tolerate an employee who, due to exhaustion and fatigue, needed to take extra breaks and was not able to work consistently through the day.  (Tr. 118.)

## IV.    The ALJ's Findings and Decision

The ALJ issued a decision on January 27, 2012.  (Tr. 43–56.)  The ALJ followed the five-step procedure for determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).  The ALJ found that Plaintiff last met the insured status requirements on December 31, 2010.  (Tr. 45.)  She found that through December 31, 2010, the claimant engaged in substantial gainful activity during the following periods:  January 1990 through December 1995, January 1997 through December 2002, and January 2004 through December 2005.  (Tr. 45.)  The ALJ found, however, that there have been continuous 12-month periods during which Plaintiff did not engage in substantial gainful activity.  (Tr. 46.)  The ALJ stated that her findings address the periods in which the Plaintiff did not engage in substantial gainful activity.  (*Id.*)

The ALJ found that Plaintiff had the following severe impairments: bipolar disorder and history of alcohol dependence.  (*Id.*)  The ALJ determined that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.*)  Specifically, the ALJ found that paragraph "B" and "C" criteria were not satisfied.  The ALJ relied heavily on the testimony of Dr. Butler in making this finding.  (Tr. 46–47.)   Further, the ALJ found that through the last date insured, the Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: performing routine, repetitive simple work, not requiring more than brief and superficial contacts with other and which is low stress, defined as not rapidly paced.  (Tr. 48.)

The ALJ noted opinions from two treating sources: Ms. Maki and Ms. Carr. (Tr. 52–53.)  The ALJ gave the opinion of Ms. Maki no weight because she did not treat or examine the Plaintiff during the relevant time period.  (Tr. 53.)  The ALJ also gave no weight to the opinions of Ms. Carr because her treatment notes do not support the degree of limitation she assessed.  (*Id.*)

The ALJ gave greatest weight to the opinion of Dr. Butler because Dr. Butler had the opportunity to review the entire record and because of her familiarity with process under which Social Security Disability is assessed.  (*Id.*) The ALJ also gave great weight to the opinion of the state agency psychological expert, as the opinion was consistent with the overall record and was made with specialized expertise in evaluating disability under the regulations.  (Tr. 54.)

21

The ALJ found the Plaintiff credible in that he would have difficulty with complex or stressful work and sustained or intense social contacts.  (Tr. 48–49.)  The ALJ stated that Plaintiff's residual functional capacity accommodates these limitations.  (Tr. 49.)  The ALJ found, however, that due to significant inconsistencies in the record as a whole, Plaintiff's claim that he is incapable of all work is not credible.  (*Id.*)  The ALJ noted that Plaintiff testified to symptoms that were not reported to his treating practitioners.  (Tr. 52.)  For example, there is no indication in the record that the claimant reported the inability to get out of bed for up to four days per week to any treating source.  (Tr. 52.)  Therefore, the ALJ found this allegation to not be credible.  (Tr. 52.)  The ALJ also noted that Plaintiff has made no effort to look for work within his limitations, despite the recommendation from Dr. Horvat for vocational rehab.  (Tr. 54.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted). "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* (citing *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213

(concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.   Analysis of the ALJ's Decision

Plaintiff makes four primary arguments in support of his motion for summary judgment. (Pl.'s Mem. 25–39.) First, Plaintiff argues that the ALJ failed to properly evaluate the opinions of treating mental health professionals. Second, Plaintiff asserts that the ALJ's finding that Plaintiff's mental impairments do not meet the requirements of Listing 12.04 is not supported by substantial evidence on the record as a whole. Third, Plaintiff argues that the ALJ's finding of residual functional capacity does not capture the concrete consequences of

Plaintiff's impairments, since it does not account for the fluctuation in severity of

limitation caused by bipolar disorder.  Fourth, Plaintiff argues that the ALJ's

credibility assessment is not supported by substantial evidence on the record as

a whole.

## A.  The ALJ Properly Evaluated the Opinions of Treating Mental Health Sources.

Plaintiff argues that the ALJ should have given greater weight to the

opinions of Theresa Carr and Melissa Maki.  Both Ms. Carr and Ms. Maki are

clinical nurse specialists (Tr. 463, 551) and do not qualify as "acceptable medical

sources" under 20 C.F.R. § 404.1513(a).  Only "acceptable medical sources" can

establish the existence of a medically determinable impairment.  20 C.F.R.

§ 416.913(a).  Evidence from medical sources who are not "acceptable medical

sources" may, however, be used to show the severity of the individual's

impairment and how it affects the individual's ability to function.  SSR 06-03p,

2006 WL 2329939 (Aug. 9, 2006).

The weight given to evidence from medical sources who are not

"acceptable medical sources" will vary according to the particular facts of the

case.  *Id.*  The same factors used to evaluate "acceptable medical sources" may

also be used to evaluate opinion evidence from other sources.  *Id.*  Thus, the ALJ

may use such factors as the length of the treating relationship, how consistent

the opinion is with other evidence, how well the source supports the opinion, and

the expertise of the source.  *Id.*  However, "[n]ot every factor for weighing opinion

evidence will apply in every case." *Id.* Additionally, in appropriate circumstances, opinions from State agency medical and psychological consultants "may be entitled to greater weight than the opinions of examining sources." SSR 96-6p, 1996 WL 374180 (July 2, 1996).

The ALJ gave supported reasons for giving no weight to the opinions of Ms. Maki and Ms. Carr. The ALJ discounted Ms. Maki's opinion because she only treated the Plaintiff after the last date insured and offered no opinion about his status prior to December 31, 2010. (Tr. 52–53.) Because the ALJ's purpose was to assess the Plaintiff's medical condition as of the last date insured, her decision to discount the opinion of Ms. Maki was proper.

The ALJ also permissibly weighed the opinion of Ms. Carr. The ALJ considered Ms. Carr's professional qualifications and the extent to which she provided evidentiary support for her conclusions. (Tr. 50, 54.) Additionally, the ALJ considered the extent of Ms. Carr's contacts with the Plaintiff, the length of the treatment relationship, and the frequency of examination. (Tr. 51.) The ALJ ultimately declined to give Ms. Carr's opinions weight because her treatment notes did not support the degree of limitation she assessed. (Tr. 53.) Under 20 C.F.R. § 404.1527, "[t]he more a medical source presents relevant evidence to support an opinion . . . the more weight we will give that opinion." Accordingly, the ALJ acted permissibly in giving Ms. Carr's opinion less weight after considering various factors and concluding that the treatment notes did not support the degree of limitation assessed.

The ALJ justified giving great weight to the opinion of Dr. Butler by explaining that Dr. Butler had the opportunity to review the entire record and is familiar with the Social Security disability process.  (Tr. 49.)  The ALJ gave the opinion of Dr. Horvat great weight based on its consistency with the overall record.  (Tr. 51.)  The ALJ also gave great weight to the opinion of the state agency psychological expert as the opinion was consistent with the overall record and was made with specialized expertise in evaluating disability under the regulations.  (Tr. 54.)

In sum, the ALJ gave supported reasons for her decisions of how to accord weight to each source of evidence.  The ALJ may grant less weight to a treating source's opinion when that opinion conflicts with other substantial medical evidence contained within the record.  *Prosch v. Apfel*, 201 F.3d 1010, 1013–14 (8th Cir. 2000).  It is the ALJ's role to resolve conflicts between consultants and treating sources' opinions.  *Cantrell v.* Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000).  Accordingly, the ALJ did not err in declining to give weight to the opinions of Ms. Maki and Ms. Carr.

## B. The ALJ's finding that Plaintiff did not meet the requirements of Listing 12.04 is supported by substantial evidence on the record as a whole.

To meet Listing 12.04, Plaintiff must show either that (1) his bipolar disorder and history of alcohol dependence result in at least two of the four criteria listed in Paragraph B, or (2) he has a documented chronic affective

disorder resulting in one of the three criteria listed in Paragraph C.  20 C.F.R. Pt. 404, supbpt. P, app. 1 § 12.04.

To meet the Paragraph B listings, Plaintiff must show that his condition resulted in at least two of the following: (1) marked restrictions of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintain concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *Id.* § 12.04(B).  The ALJ concluded that Plaintiff had (1) marked restrictions of activities of daily living, (2) moderate difficulties in maintaining social functioning, (3) moderate difficulties in maintaining concentration, persistence, or pace, and (4) no episodes of decompensation.  (Tr. 46–47.)

In determining that Plaintiff had only moderate difficulties in maintaining social functioning, the ALJ cited that Plaintiff conversed with others at the Mission, ate his meals at the Salvation Army or the Mission, went to the park or library, was "usually okay" when interacting with authority figures when not manic, had a support network of friends, liked to go to the sports bar to drink beer and watch sports, obtained free clothing, obtained gas money from friends, and has been described as cooperative.  (Tr. 47.)  There is substantial evidence in the record as a whole supporting the ALJ's determination that Plaintiff had no more than a moderate limitation in social functioning.

In determining that Plaintiff had only moderate difficulties in maintaining concentration, persistence, or pace, the ALJ cited substantial evidence on the

28

record.  (Tr. 47.)  The field officer interviewer did not note any problems with understanding, coherency, answering, or concentrating.  (Tr. 47; Tr. 243–44.)  Plaintiff could check his email.  (Tr. 47; Tr. 274.)  He usually could follow written and spoken instructions fairly well.  (Tr. 47; Tr. 275.)  Medical providers generally reported normal attention and concentration.  (Tr. 47.)  His memory was typically intact, and his thought processes were logical and organized.  (*Id.*)  Accordingly, there is substantial evidence in the record as a whole to support the ALJ's finding that Plaintiff has no more than moderate limitations on maintaining concentration, pace, or persistence.

The ALJ found no episodes of decompensation.  The record does not indicate any episodes of decompensation which have been of extended duration during the relevant time period.  Accordingly, the ALJ's finding that the Plaintiff had no episodes of decompensation is supported by substantial evidence.

There is also substantial evidence in the record to support that Plaintiff did not meet the paragraph "C" criteria.  (Tr. 47.)  The ALJ relied on Dr. Butler's testimony in evaluating the "C" criteria.  (*Id.*)  The record does not show a medically documented chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, along with one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental

demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one of more years' inability to function outside of a highly supportive living arrangement, with an indication of continued need for such a living arrangement.  Because there insufficient evidence on the record to satisfy the "C" criteria, the ALJ's finding in this regard is supported by substantial evidence.

**C. The ALJ's finding on residual functional capacity is supported by substantial evidence on the record as a whole.**

Plaintiff argues that the ALJ's finding of residual functional capacity does not account for the fluctuating nature of Plaintiff's bipolar disorder.  Plaintiff contends that the ALJ's hypothetical questions to the vocational expert did not accurately set forth Plaintiff's limitations.

When asked about the limitations described by Ms. Carr, the vocational expert did testify that a person with such limitations could not find competitive employment.  (Tr. 117.)  However, as discussed above, the ALJ permissibly gave no weight to Ms. Carr's opinion.  Hypotheticals presented to vocational experts need only include impairments that are supported by the record and that the ALJ accepts as valid.  *Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cr. 2000).  Because the ALJ found that Ms. Carr's opinions were unsupported by her treatment notes and other evidence in the record, the ALJ was entitled to omit such limitations from the hypothetical questions and deem irrelevant the answers to such questions.

The ALJ carefully weighed the evidence on the record, and accounted for the fluctuating nature of Plaintiff's condition by concluding that Plaintiff could no longer perform his intellectually demanding past work.  The ALJ found that given Plaintiff's mental limitations, he had the residual functional capacity to perform work that was routine, repetitive, and simple, not requiring more than brief and superficial contact with others, and was low stress—defined as not rapidly paced. (Tr. 48.)  Accordingly, substantial evidence on the record as a whole supports the ALJ's findings on Plaintiff's residual functional capacity.

### D. The ALJ's credibly assessments are supported by substantial evidence on the record as a whole.

The ALJ found Plaintiff's claims credible to the extent that he would have difficulty with highly complex or stressful work.  (Tr. 49.)   The ALJ found not credible Plaintiff's allegations that he was unable to get out of bed for up to four days a week, as he had never reported this symptom to a treatment provider. The ALJ also did not find Plaintiff credible in his statement that he was unable to perform all work, due to inconsistencies in record.  (Tr. 48–49.)

Plaintiff argues that there are no inconsistencies in the record if evidence is "properly weighed."  (Doc. No. 11, Pl.'s Mem. at 38.)  It is the ALJ's role to weigh conflicting evidence, and this Court may not substitute its own opinion for that of the ALJ.  *See Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  When an ALJ provides good reasons for his credibility finding, courts should defer to that finding, because the ALJ is responsible for deciding questions of fact.  *Casey v.*

*Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). Because the ALJ cited good reasons for her credibility findings, the ALJ's credibility assessments are supported by substantial evidence on the record as a whole.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 10), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 12), be

**GRANTED**; and

3.      This case be **DISMISSED WITH PREJUDICE**, and judgment be

entered.

Date: December 18, 2014

 _s/ Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 2, 2015** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute on order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.